**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2566
_____

UNITED STATES OF AMERICA

v.

KHAYREE HARRISON,

Appellant

_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 09-cr-00756-1)
District Judge: Hon. Timothy J. Savage
_____

Argued March 26, 2012
_____

BEFORE:  FUENTES, SMITH, and JORDAN, *Circuit
Judges*

(Opinion Filed:  August 7, 2012)

1

Brett G. Sweitzer **(Argued)**
Mark T. Wilson
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

*Counsel for Appellant Khayree Harrison*

Arlene D. Fisk
William Weilman
Robert Zauzmer **(Argued)**
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee the United States of America*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

On October 12, 2009, three Philadelphia police officers entered a private residence located at 2114 North Franklin Street in Philadelphia without a warrant because they believed the house to be abandoned. Upon searching the house, they found Khayree Harrison sitting in a recliner with a gun, scales, pills, and cocaine base on the table next to him.

The police took Harrison into custody, seized the gun, and obtained a warrant to seize the rest of the items. The government charged Harrison with possession with intent to distribute five grams or more of cocaine base. Harrison moved to suppress the physical evidence on the grounds that it had been confiscated pursuant to a search that violated the Fourth Amendment. The District Court held a hearing and denied the motion, finding that although Harrison had a reasonable expectation of privacy in the house, the police officers were operating under the mistaken but reasonable belief that the house was abandoned. Harrison appealed. We will affirm.

## I.

## A.

Khayree Harrison lived at 2015 North Eighth Street in Philadelphia, but paid Nicole Hawkins $750 a month to use the house at 2114 North Franklin Street starting in August 2009.[1] Harrison spent only one or two nights a week at the

---

[1] Nicole Hawkins testified at the suppression hearing that no one was renting the house at the time of the search. Though it did not make a specific finding to this effect, the District Court did not credit her testimony. She was an evasive witness, and was unable or unwilling to answer simple questions about her ownership interest in the house, how she acquired it, who paid rent, and whether she was making improvements to it. As such, finding her incredible was not clearly erroneous. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

2114 North Franklin Street house. He testified that he had a key to the house and entered the home by unlocking the front door. He had paid Nicole Hawkins rent for October 2009.

On October 12, 2009, Philadelphia Police Officer Robert McCarthy was driving around the neighborhood in a marked police car when he spotted a dirt bike on the side of the road. He pulled over, retrieved the bike's vehicle identification number, began a search for the owner's information on his computer, and drove away. About ten minutes later, he learned that the bike was reported stolen. He went back to get the bike, but it was already gone. Later that day, he spotted the same bike being ridden by an unknown male. Officer McCarthy did not follow or apprehend him at that time. Around 8 p.m. that evening, Officer McCarthy was joined by Officer Matthew McCarthy, his cousin, and Officer Joseph O'Malley. They decided to walk through the yards between Franklin and 8th Streets to see if they could find the stolen bike. They spotted the bike in the backyard of 2114 North Franklin Street. The officers walked around to the front yard, where they noticed that the front door was open. They also saw candlelight through a boarded-up window on the first floor. Believing the house to be abandoned, the three officers walked in the front door and opened the door on their immediate left. They did not knock or announce their presence.

The officers saw Harrison sitting in a recliner chair. Next to him, he had a gun, scales, pills, and an unknown substance. Seeing the officers, Harrison ran out of the room and into the basement. The officers followed and took him into custody. They then contacted an Officer Reynolds, also of the Philadelphia Police Department, and had him prepare a

4

search warrant for the house. In preparing the warrant, Officer Reynolds discovered that Nicole Hawkins Investment Company owned the property.

At the suppression hearing, the officers testified to the condition of the house and the District Court credited their testimony. The officers testified consistently that 2114 North Franklin Street was in a state of constant and severe disrepair. Specifically, Officer Robert McCarthy testified that the backyard was full of trash and there were "boards on the door and the window." Appendix. ("App.") at A26. The yard was covered in weeds and generally untended. There was nothing covering the windows on the second floor. On the front of the house, they observed that the two bottom windows were boarded up with plywood, there was trash all over the yard, and the front door was unlocked and ajar.

Officer Matthew McCarthy, who had been at the house many times before, testified that "the front door [was] never locked," App. at A47, and was always open. In fact, he seemed unsure of whether the door could be locked. He also testified that the condition of the house never changed. It remained in the same state of disrepair each time he saw it.

Officer McCarthy also testified about the condition of the house's interior. He said that he entered 2114 North Franklin Street several times in the months leading up to October 12, 2009, although he never made any arrests or filled out any incident reports. He described the house as a "known drug residence," and said that one would often "see drug users and dealers hanging out outside, going in and out the front door all day long." App. at A46. He observed this activity "all summer." App. at A49. Prior to October, he had

5

entered the house to kick people out numerous times. He testified that

> The whole house was filled with drug paraphernalia all over the house, trash. The front door is never locked. It's always open. The upstairs has a single mattress in the front room of the building. Drug bags all over the place, drug paraphernalia. Mostly crack bags, some heroin bags. The first floor, again, trash all over the place. The whole house smells like urine. People are often in there sleeping. There is feces in both the tub and the toilet that is never flushed because there is no water in the house. Again, I go in there routinely just to kick people out, just to keep them out of the area.

App. at A47. Officer McCarthy also said that he had no reason to believe there was electricity in the house. Ultimately, he did not think anyone could actually be living there, as "it did not seem habitable." App. at A48. He last entered the house two or three weeks prior to the search that is at issue here.

### B.

The grand jury returned an indictment that charged Harrison with possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); commission of that offense within 1,000 feet of a school, in violation of 21 U.S.C. § 860; and

6

possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).

Prior to trial, Harrison filed a motion to suppress the physical evidence against him. After a hearing, the District Court denied the motion. It held that while the property was not abandoned, "[b]ased on the appearance of the property and the officers' knowledge of the property's history, the police acted reasonably in entering the property to investigate." App. at A12.

After a jury trial, Harrison was found guilty of possession with intent to distribute but was acquitted on the other charges. The District Court sentenced him to 62 months' imprisonment. This timely appeal followed. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review factual determinations made on a motion to suppress for clear error and legal determinations de novo. *United States v. Kennedy*, 638 F.3d 159, 163 (3d Cir. 2011). The proponent of a motion to suppress bears the burden of proving that he had a legitimate expectation of privacy in the place searched and that the search was illegal. *Kennedy*, 638 F.3d at 163. Because the District Court denied Harrison's suppression motion on the grounds that the search was permissible, "we must review the propriety of the warrantless search that led to the discovery of incriminating evidence." *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005). In so doing, we construe the record in the light most favorable

to the government. *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

III.

A.

The Supreme Court has consistently held that "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991) (internal quotation marks omitted). At issue here is the abandonment exception, which we consider in the context of the good faith exception to the exclusionary rule typically applied to evidence seized without a warrant. *See United States v. Leon*, 468 U.S. 897, 919-20 (1984) ("[W]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances" (internal quotation marks and citations omitted)). We first consider the contours of abandonment.

A warrantless search of property is permissible under the Fourth Amendment where the owner has abandoned his reasonable expectation of privacy in that property. *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *Abel v. United States*, 362 U.S. 217 (1960)). This

8

determination must be made from an objective viewpoint, and proof of intent to abandon must be established by clear and unequivocal evidence. *Id.* We look at the totality of the facts and circumstances in making such a determination. *See id.*; *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011). In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment. *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999).

We note that, "abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item."[2] *Fulani,* 368 F.3d at 354 (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)); *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005). Thus, our holding will not turn on whether the house was abandoned under the common law of property. "Indeed, there is a real difference between property-law and constitutional abandonment, for courts have repeatedly found abandonment for constitutional purposes in situations that might not support a finding of abandonment in the common-law understanding." *United States v. Redmon*,

---

[2] The Supreme Court's recent decision in *United States v. Jones*, --- U.S. ---, 132 S.Ct. 945 (2012) (finding that a common law trespass constitutes a "search" under the Fourth Amendment) does not alter our analysis. The question before the Court in *Jones* was different than the question currently before us. As Justice Sotomayor noted in her concurrence, the Court was grappling with the question of when a search occurred, which is not at issue here. It is undisputed that the officers' entry constituted a "search" under the Fourth Amendment.

9

138 F.3d 1109, 1127 (7th Cir. 1998) (Flaum, J., concurring) (en banc). Therefore, the fact that for common law purposes real property cannot be abandoned, *see e.g.*, *Pocono Springs Civic Assoc., Inc. v. MacKenzie*, 667 A.2d 233, 236 (Pa. Super Ct. 1995), is not dispositive. *See United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972) ("[W]e hold that local law of real property does not provide the exclusive basis upon which to decide Fourth Amendment questions."). Rather, it will inform our inquiry. *See Stevenson*, 396 F.3d at 546. As such, what the common law property rules suggest is that abandonment of real property under the Fourth Amendment is difficult, but not impossible, to establish.

The home occupies a sacrosanct place in our Fourth Amendment jurisprudence. *Hudson v. Michigan*, 547 U.S. 586, 603 (2006) (Kennedy, J., concurring). "Privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginning of the Republic." *Id.*

Nevertheless, a person can lose his reasonable expectation of privacy in his real property if he abandons it. Thus, a person can, as he can with any other property, sufficiently manifest an intent to abandon his house. *See McKenney*, 635 F.3d at 359; *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir 1987); *Mann v. Cannon*, 731 F.2d 54, 59 (1st Cir. 1984) (finding that a warrantless search of a doctor's house was permitted when the "the house had become open to the public, vandalized, uninhabitable, and from appearances virtually abandoned."); *United States v. Callabrass*, 607 F.2d 559, 565 (2d Cir. 1979) ("Thus it appears to all intents and purposes that appellant abandoned the house and the property in it.") (Oakes, J., dissenting); *United States v. Wilson*, 472

10

F.2d 901, 903 (9th Cir. 1972); *see also*, *People v. Taylor*, 655 N.W.2d 291 (Mich. Ct. App. 2002); *State v. Hunter*, 2012 WL 1868393, at *4 (N.J. Super. Ct. App. Div. May 24, 2012); *State v. Linton*, 812 A.2d 382, 383-84 (N.J. Super. Ct. App. Div. 2002) (permitting a search of a house that "had all the indicia of abandonment"); *State v. McKinney*, 637 S.E.2d 868, 871 (N.C. 2006) ("A reasonable expectation of privacy in real property may be surrendered, however, if the property is permanently abandoned."); Wayne LaFavre Search and Seizure: A Treatise on the Fourth Amendment § 2.3(e) (4th Ed. 2011) ("It has often been held that if a defendant has in fact abandoned the place where he formerly resided, then he may not have suppressed from evidence what the police find on those premises after the time of abandonment."); *cf. United States v. Wyler*, 502 F. Supp. 959, 968 (S.D.N.Y. 1980); *State v. Carter*, 54 So. 3d 1093, 1095 (La. 2011) ("We agree with the premise of the state's argument . . . that an individual does not possess a reasonable expectation of privacy in an abandoned home and therefore may not complaint about a warrantless entry of the premises by the police.").

Even the framework established by a plurality of the Supreme Court for analyzing searches of burned down houses implicitly recognizes that a residence can be abandoned. In *Michigan v. Clifford*, 464 U.S. 287, 289, 293 (1984), the Supreme Court found unconstitutional a warrantless search of a home after a devastating fire. In the early morning, a fire broke out at the home of Raymond and Emma Clifford. *Id.* at 289. By 1:00 p.m. that day, the fire was extinguished and a work crew was pumping water out of the home. *Id.* at 290. A fire department inspector entered the home without a warrant and searched it, finding evidence of arson. *Id.* The

11

constitutionality of the warrantless search, a plurality of the Court held, can turn on "whether there are legitimate privacy interests in the fire-damaged property." *Id.* at 292; *see also United States v. Francis*, 327 F.3d 729, 735 (8th Cir. 2003) (finding that "the existence of legitimate privacy interests," to be an important factor in determining whether a post-fire warrantless search of a house was permitted). Expectations of privacy "may remain" in fire-damaged homes because "[p]eople may go on living in their homes or working in their offices after a fire. Even when that is impossible, private effects often remain." *Id.* (quoting *Michigan v. Tyler*, 436 U.S. 499, 505 (1978)) (internal quotation marks omitted). The plurality enumerated several factors that should be analyzed in determining whether a legitimate expectation of privacy remained: "the type of property, the amount of fire damage, the prior and continued use of the premises, and, in some cases, the owner's efforts to secure [the home] against intruders." *Id.*; *see also United States v. Mitchell*, 85 F.3d 800, 805-6 (1st Cir. 1996). In other words, there are circumstances in which the combination of fire damage and an owner's own acts so exposes a home to the outside world that the owner has relinquished his legitimate expectation of privacy in that home. [3] *Cf. Clifford*, 464 U.S. at 292.

---

[3]  Harrison's reliance on the Seventh Circuit's decision in *Wilson v. Health and Hospital Corp.* 620 F.2d 1201 (7th Cir. 1980) is misplaced. There, one-half of a duplex was burned down and effectively left open and unsecured. *Wilson*, 620 F.2d at 1206. The District Court determined that there was no reasonable expectation of privacy because the house was so exposed to the outside world that no one would have had an objective expectation of privacy in the property. *Id.* at 1208. The Seventh Circuit disagreed, finding that the

The same logic applies to a person's abandonment of his house. A person can, through his own acts or omissions, manifest an intent to relinquish his legitimate expectation of privacy in his real property, as the same test applies regardless of the nature of the property. This is, however, a difficult standard to meet, and one that requires a careful analysis of all the facts and circumstances of a particular case. Before the government may cross the threshold of a home without a warrant, there must be clear, unequivocal and unmistakable evidence that the property has been abandoned. Only then will such a search be permitted.

### B.

In this case, it is undisputed that the house was not actually abandoned and that Harrison, as a renter, possessed a reasonable expectation of privacy in the property. Therefore, the only issue before us is whether the police officers' belief that the house was abandoned justified their warrantless entry.

---

search of the house did not qualify under either the open fields or plain view doctrines. *Id.* at 1209. However, the Seventh Circuit remanded for an evidentiary hearing and explicitly acknowledged that upon a fuller record "it may well be . . . that the plaintiff had effectively abandoned his right to exclude." *Id.* at 1213. It also acknowledged that "the open and unsecure condition of the premises . . . would point away from a reasonable expectation [of privacy]." *Id.* Thus, *Wilson* does not stand for the proposition that a person cannot abandon a residence.

The law does not require that police officers always be factually correct; it does demand, however, that they always be reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). "Consequently, a reasonable mistake of fact does not violate the Fourth Amendment." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006) (internal quotation marks omitted); *see also United States v. Elliott*, 50 F.3d 180, 185-86 (2d Cir. 1995). In deciding what is reasonable, a court is to apply an objective standard, looking at whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief" that the search was permissible. *Rodriguez*, 497 U.S. at 188 (internal quotation marks omitted).

Unlike a mistake of fact, a search conducted pursuant to a police officer's mistake as to the governing law, even if reasonable, is not permitted under the Fourth Amendment. *Delfin-Colina*, 464 F.3d at 397, 399 ("[A] mistake of law by the seizing officer will render a traffic stop per se unreasonable under the Fourth Amendment" unless facts are offered that "show that the identified law was actually broken.").

Harrison contends that the police officers made a mistake of law when they entered 2114 North Franklin Street. Their mistake, according to Harrison, was that they assumed a house could be abandoned at all. Thus, the argument goes, it is irrelevant whether the officers were reasonable in their belief. We disagree. First, as discussed above, a house can be abandoned for Fourth Amendment purposes, and thus the officers did not make a mistake of law. Second, the officers made a mistake of fact. Their observations of the property

14

over time suggested to them that whoever once had an expectation of privacy in the property had since effectively relinquished it. As they testified before the District Court, the police officers believed that the house was unfit for human habitation and that no one lived there. This is a mistake of fact, not of law. In essence, the officers were mistaken in their belief that there existed no person who had a remaining expectation of privacy in the property. Thus, under our case law governing mistakes of fact, the officers' warrantless search of the house was permissible if their mistake was reasonable.

C.

1.

Before turning to a discussion of the reasonableness of the officers' mistake, we must deal with the threshold inquiry of what information we may rely upon in deciding the question. Before us, Harrison contends that we should exclude any observations Officer Matthew McCarthy made of the interior condition of the house because each entry he made was without a warrant in violation of the Fourth Amendment. The government contends that Harrison failed to raise this argument before the District Court and that it is waived. We agree. It is well-settled that suppression arguments raised for the first time on appeal are waived absent good cause. *United States v. Rose*, 538 F.3d 175, 182 (3d Cir. 2008). Indeed, "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised" prior to trial. Fed. R. Crim. P. 12(e); *see also Rose*, 538 F.3d at 180.

15

Harrison's counsel neither referenced nor objected to the officer's prior entries in his initial memorandum of law in support of his motion to suppress. The government, however, made explicit reference to the officer's prior entries in its opposition brief. Thus, at a minimum, Harrison's counsel was on notice that the government would be introducing and relying upon such evidence in opposing his motion. Nevertheless, no reply was made.

At the hearing, Harrison did not object when the government questioned the police officers about their prior entries, did not build a record supporting his argument that the facts did not justify the initial entries under an abandonment theory, and did not make any legal arguments relevant to abandonment during his colloquy with the District Court. Though he referenced Officer McCarthy's initial entries, he confined his oral argument solely to the question of whether the evidence should be suppressed because it would deter future police misconduct under the Supreme Court's balancing test in *Herring v. United States*, 555 U.S. 135 (2009). Such an argument presupposes that the search violated the Fourth Amendment and represents a different and distinct theory of suppression.

Thus, by operation of Rule 12(b) of the Federal Rules of Criminal Procedure, this argument is waived absent good cause. *Rose*, 538 F.3d at 179-80. Harrison presents no reason, and we see none, why good cause exists for the failure to raise this issue before the District Court. Because this argument is waived, we will include the entirety of Officer Matthew McCarthy's testimony regarding the interior of the house.

16

2.

Turning to the central question of this appeal, we conclude that, based on the totality of the circumstances, the officers were reasonable in their mistake of fact. The police officers testified consistently that the exterior of 2114 North Franklin Street was in a state of severe disrepair. There was trash strewn about, the lawn was overgrown with weeds, and the windows on both levels were either boarded up or exposed.[4] The front door was left open, and the lock may have been broken. However, this alone would not have been sufficient to find the officers' mistake reasonable.

It is unreasonable to assume that a poorly maintained home is an abandoned home. A one-time look at 2114 North Franklin Street in its dilapidated condition would not justify the police entering it without a warrant because a reasonably cautious officer would only assume that the person who occupied the home did not maintain it as they should, not that they had clearly manifested an intent to relinquish their

---

[4] We note that boarded-up windows can cut against finding that the house was abandoned in that it suggests an individual is taking steps to secure the property. Conversely, the always open front door weighs in favor of finding that the house was abandoned as it suggests an individual is not taking steps to secure the property or to exclude others. As the Supreme Court noted in *Michigan v. Clifford*, 464 U.S. 287, 289 (1984), such efforts must be considered as part of an inquiry into whether an individual relinquishes his expectation of privacy in his property.

17

expectation of privacy in the house.[5]  There simply is no "trashy house exception" to the warrant requirement.

Here, however, the police officers knew more. Specifically, Officer Matthew McCarthy knew that the inside of the house matched the rundown condition of the exterior. It was a known drug den.  There were no furnishings other than a single mattress on the top floor, human waste filled the bathtub and toilets, and there was no evidence of running water or electricity.  During his prior entries, Officer McCarthy observed squatters, who claimed no right to be there. The house was so dilapidated that the officers believed it was not fit for human habitation.[6]  This, combined with the exterior condition of the property, is probative evidence of abandonment.

---

[5]  There may be situations where it is ambiguous to a reasonable officer whether a dilapidated house is abandoned. In such cases, the officer would need to make further inquiries into the property's status.  *See United States v. Cos*, 498 F.3d 1115, 1128-29 (10th Cir. 2007) (finding that a duty to investigate further is triggered when the facts known to the officers are ambiguous, such as when it is unclear whether someone has the authority to consent to a search.).  Such an inquiry was unnecessary here, because, given the officer's extensive knowledge of the home and its history, the facts seemed unambiguous.  Thus, no duty to inquire further was triggered.

[6]  Indeed, even Harrison himself, despite paying nearly a thousand dollars a month to rent the property, did not live there.

The Eighth Circuit in *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) similarly concluded that when both the exterior and the interior of a house are in an extreme state of disrepair suggesting that it is uninhabitable, it is reasonable for officers to assume the house is abandoned. The Eighth Circuit observed:

> The officers found the house in disrepair, with an unkempt yard and a fence that was incomplete and falling apart. There were no vehicles parked in the driveway. No one responded when the officers knocked on the front door, and the back door was open three or four inches. Through the open door, the officers could see into the kitchen, where the cabinets were open and empty, the refrigerator was open, empty, and pulled away from the wall, and there was no furniture or personal effects. There were no lights on, sounds from appliances, or other indications that the house had electrical power. In light of these facts, it was reasonable for Harrison and Pollreis to conclude that the house was abandoned.

*McKenney*, 635 F.3d at 359. To the Eighth Circuit, the police were reasonable in concluding, upon seeing the decaying house, and "open and empty" drawers and appliances, that the house was abandoned. It was as if some time ago someone had packed up in haste never to return. *See id.* The officers could only have reached such a conclusion once they observed the condition of the property's interior. Without those additional facts, it is unlikely that the officers' belief would have been reasonable.

19

Ours is an even stronger case for abandonment than *McKenney*, because here the officers had knowledge of the property's history. This knowledge—particularly their observation of its unchanging, uninhabitable condition over several months—dispositively bolsters the reasonableness of the officers' belief. Based on the record, we assume that Officer Matthew McCarthy began observing the property in approximately June 2009.[7] Thus, he had about four months of observations of the house's condition before he entered it in October.

It is one thing to infer that a person has abandoned his expectation of privacy in his home based on a one-time observation. It is quite another to observe that same property in that same dilapidated condition with a front door that is "always open" over the course of several months. Over time, the inference that the property has been "thrown away" becomes significantly stronger. Given the combination of the rundown exterior, the "always open" door, the trashed interior, and the extended observations over time, the police officers were reasonable in their mistaken belief that the house was abandoned. Based on the totality of the circumstances, the warrantless search was permitted under the Fourth Amendment and the District Court did not err when it denied Harrison's motion to suppress.

---

[7] Officer McCarthy testified that he observed the house over the course of months, noting that he observed known drug dealers entering the home all summer. This suggests he entered the home from around June through October.

III.

The District Court's order denying the motion to suppress will be affirmed.