GREENAWAY, JR., Circuit Judge,
dissenting, joined by McKEE, Chief Judge, and AMBRO, FUENTES, and SMITH, Circuit Judges.
Once touted as a way to ensure that the rights of citizens are protected from overzealous law enforcement, today the exclusionary rule’s very existence, long eroding, is in serious doubt. Since the inception of the exclusionary rule, critics have disputed its validity. In words often quoted, [then Judge] Cardozo questioned whether “[t] he criminal is to go free because the constable has blundered.” People v. Defore, 242 N.Y. 13, 150 N.E. 585, 587 (1926). Courts have given power to the words of the critics by using the good faith exception to chip away at the breadth of the rule. The majority, in its alternative holding, expands the good faith exception to the point of eviscerating the exclusionary rule altogether by failing to provide any cognizable limiting principle. Now, law enforcement shall be further emboldened knowing that the good faith exception will extricate officers from nearly any evidentiary conundrum.
Law enforcement violated Katzin’s Fourth Amendment rights.[1] In this case, the only means by which the evidence obtained through such a violation could be used against Katzin is through application of the good faith exception. To achieve this end, the majority argues that good faith applies, even without the existence of binding appellate precedent. What law enforcement did in this case was to “rely on precedent to resolve legal questions as to which ‘[Reasonable minds ... may differ....’ ” United States v. Davis, 598 F.3d 1259, 1267 (11th Cir.2010), aff'd, -U.S. -, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (quoting United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d *188 677 (1984)). In such an instance, “the exclusionary rule is well-tailored to hold [law enforcement] accountable for their mistakes.” Id. The majority disagrees with this proposition and instead gives free rein to law enforcement to interpret legal propositions without any consequence if and when they are wrong.
Law enforcement contends that they acted reasonably by consulting with their co-investigators at the U.S. Attorney’s Office. However, what is missing here is neutral authorization of any sort for the conduct undertaken by the police. Consultation with the U.S. Attorney’s Office is not a panacea for the constitutional issues raised here. Katz v. United States, 389 U.S. 347, 356, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (“It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized.”) (emphasis added). Even if the majority believes that this neutral authorization requirement (which admittedly pre-dates the good faith exception) has been undercut by subsequent Supreme Court decisions, we are still required to follow it. Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”). Neutral authorization for law enforcement’s actions has been the hallmark of the good faith exception’s application. Without this control, what is the fail-safe to preclude further erosion? I fear there is none. For these reasons, I respectfully dissent.
In its primary holding, the majority turns the rationale of Davis on its head and concludes that two disparate Supreme Court precedents — that the Government concedes do not constitute binding appellate precedent — now fit the bill.[2] How does the majority justify the creation of such a notion? Such a leap constitutes willful disregard of the critical distinctions between this case on the one hand and United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) on the other. Further, this leap reveals the majority’s true purpose: to accommodate the desires of law enforcement.
I. Expansion of the Good Faith Exception
The majority’s alternative holding, that good faith should apply even if it does not fit the Davis paradigm, is troubling. The essence of the majority’s holding is that any time a course of conduct by the police, particularly regarding technological advancements, has not been tested or breaks new ground, law enforcement will be enti- *189 tied to the good faith exception.[3] This directly contravenes one of the principles expounded in Davis: that evidence admitted pursuant to the good faith exception is so admitted because the police relied on binding appellate precedent that, as Justice Alito said in his majority opinion, “specifically authorized the] particular police practice.... ” Davis, 131 S.Ct. at 2429 (emphasis added). Indeed, as Justice Sotomayor noted in her concurrence, Davis did not “present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled.” Id. at 2435 (Sotomayor, J., concurring).[4]
I do not dispute the majority’s contention that “Davis is but one application of the good faith exception that applies when police ‘conduct a search in objectively reasonable reliance on binding judicial precedent.’ ” Majority Op. at 177 (quoting Davis, 131 S.Ct. at 2428). Instead, my point goes to the manner in which the good faith exception is being expanded. It has everything to do with neutral authorization and with the ultimate decision-making not being in the hands of law enforcement. This is what the framers envisioned when they wrote the Fourth Amendment requiring that “no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U.S. Const. amend. IV.
Historically, the Supreme Court has held the good faith exception covers situations where law enforcement personnel have acted in objectively reasonable reliance on some seemingly iihmutable authority or information that justifies their course of action., See, e.g., United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (later-invalidated warrant); Massachusetts, v. Sheppard, 468 U.S. 981, 990, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (exclusionary rule inapplicable when warrant is invalid due to judicial clerical error); Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (subsequently overturned statute); Davis, 131 S.Ct. 2419 (later-reversed binding appellate precedent); Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (undiscovered error in court-maintained database); Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (undiscovered error in police-maintained database).
It is clear from the line of good faith cases that the exception is limited to cases involving either: (a) nondeterrable, isolated mistakes, or (b) cases in which police officers rely upon a neutral third-party’s *190 authorization.[5] Such delineated exceptions allow us to hold fast to the constitutional guarantee of “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures-” U.S. Const. amend. IV. Thus, “[i]t remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.” United States v. Harrison, 689 F.3d 301, 306 (3d Cir.2012) (internal quotation marks omitted). The majority’s opinion, absent such a guiding principle, has now leant its imprimatur to the notion that even if law enforcement’s conduct violates the Fourth Amendment, it is perfectly fine because the evidence can come in through good faith. The exception becomes the rule.
The majority argues that the purpose of the exclusionary rule is to deter wrongful conduct of law enforcement, and that here there is no wrongful conduct. As the Supreme Court has explained, “police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” Herring, 555 U.S. at 144, 129 S.Ct. 695; Davis, 131 S.Ct. at 2429 (cautioning courts not to discourage “the officer from doing his duty”) (alteration and internal quotation marks omitted). The majority determines that acting on a good-faith mistake about the law, without seeking a warrant even when there was time to get one, is not conduct which should be deterred. But Davis itself suggests that it is proper for the exclusionary rule to “punish” such an “error.” Davis, 131 S.Ct. at 2428.
Here, law enforcement personnel made a deliberate decision to forego securing a warrant before attaching a GPS device directly to a target vehicle in the absence of binding Fourth Amendment precedent authorizing such a practice. Indeed, the police embarked on a long-term surveillance project using technology that allowed them to monitor a target vehicle’s movements using only a laptop, all before either this Circuit or the Supreme Court had spoken on the constitutional propriety of such an endeavor. In an area without any guidance from the Supreme Court or from our Circuit, law enforcement and the prosecutors looked to our sister circuits to find the universe of case law that supported the most beneficial position to them. For purposes of our analysis, we may not assume that Knotts and Karo were binding appellate precedent simply because that is what law enforcement, with assistance from the U.S. Attorney’s Office, concluded at the time of their decision to place the GPS on Katzin’s van. Thus, law enforcement made a deliberate decision implicating constitutional principles on the basis of a 3-1 circuit split, absent any specific authorization for their conduct. What if the split had been 2-2 or 1-3? Is there a basis from which one can imagine that law enforcement’s decision would have been different?
True, the police did not act in a total vacuum, but their chosen course of action when presented with such a novel constitutional predicament is nonetheless worrisome. In lieu of a binding proclamation from either this Circuit or the Supreme Court — and instead of seeking approval from a neutral magistrate — law enforcement personnel looked to other (non-binding or distinguishable) authorities like our sister circuits’ decisions. Essentially, they extrapolated their own constitutional rule, in consultation with the U.S. Attorney’s Office, and applied it to this case. This *191 intra-executive agency consultation falls short of a basic requirement of the Fourth Amendment: that “where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen’s private premises or conversation.” United States v. U.S. District Court (Keith), 407 U.S. 297, 316, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Simply put, the police in this case dodged a basic constitutional separation of powers requirement by choosing to assume a constitutional rule not clearly established by binding judicial precedent.
I do not believe that this intra-executive consultation absolves police personnel’s behavior. Now, the assumption by law enforcement that their own self-derived rule sanctioned their conduct becomes true, thanks to the majority’s analysis. Such decision-making is wrongful conduct that can and should be deterred — for that is the primary purpose of the exclusionary rule! The police practice at issue here effectively disregarded the possibility that we could find a GPS search constitutes a Fourth Amendment violation requiring a warrant.
Where we have not yet ruled on the constitutionality of a police tactic, law enforcement personnel have two choices: (a) assume that their conduct violates the Fourth Amendment and that we will require them to obtain a warrant, or (b) gamble, at the risk of having evidence excluded, that we will find no Fourth Amendment violation in a particular situation. This is in line with the Supreme Court’s suggestion that law enforcement officials should be incentivized to “err on the side of constitutional behavior.” United States v. Johnson, 457 U.S. 537, 561, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).[6] Excluding the evidence in this case would incentivize just that and would therefore result in “appreciable deterrence” of future Fourth Amendment violations. Leon, 468 U.S. at 909, 104 S.Ct. 3405 (internal quotation marks omitted).
I would not hold, of course, that the police can never make assumptions about our future Fourth Amendment rulings. If their analysis is correct and we ultimately affirm the constitutionality of a search, then the police are rewarded with full use of any evidence derived from the search. If their analysis is wrong, however, and the search is ultimately held to be unconstitutional, then the police cannot avoid the cost of suppression by relying on the good faith exception. Of course, the police can avoid this entire issue by requesting a warrant in the first instance, a task unburdened by time nor trouble.
Law enforcement personnel can rightly rely on a number of sources for Fourth Amendment guidance — including relevant *192 decisions by the Supreme Court and this Circuit, warrants, and statutes. We, both as a court and as a society, expect that law enforcement officers will consult these sources—it is a part of how we expect reasonable officers to act. Davis, 131 S.Ct. at 2429. Deterring such activity, therefore, would not serve the purposes of the exclusionary rule. Id. This case is different. Nothing in a law enforcement officer’s duties forces him either to rely on non-binding appellate precedent or to conduct the Fourth Amendment calculus himself by extrapolating from, or analogizing to, existing case law. Where an officer decides to take the Fourth Amendment inquiry into his own hands, rather than to seek a warrant from a neutral magistrate—particularly where the law is as far from settled as it was here—he acts in a constitutionally reckless fashion.
The legal landscape in this case predominantly consisted of the out-of-circuit GPS cases, the Supreme Court’s beeper decisions, and the overarching privacy expectation framework for Fourth Amendment analysis adopted in Katz and deemed to be the sole rubric for analysis until United States v. Jones, — U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Taken- together, the majority contends, these sources provide the legal authority that would lead a reasonable law enforcement officer to conclude that he was acting within the confines of the Constitution when attaching a GPS tracker to the undercarriage of Harry Katzin’s van. I do not agree that this collection of authority warrants application of the good faith exception because I remain discomfited by the lack of binding appellate guidance or other neutral authorization underlying the police action at issue here. Therefore, I would hold that the police acted with sufficient constitutional culpability to require exclusion and, more importantly, that suppression in this case would help deter future Fourth Amendment violations.
My intention would not be to bind the hands of law enforcement. I merely believe that the investigatory process established by the Constitution is the proper one: that police officers get a warrant prior to conducting a search. This is also consistent with Karo, where the Court expressly rejected the Government’s argument that requiring a warrant prior to beeper tracking would be too laborious and would substantially impede investigations. See Karo, 468 U.S. at 717, 104 S.Ct. 3296 (“The Government’s contention that war-rantless beeper searches should be deemed reasonable is based upon its deprecation of the benefits and exaggeration of the difficulties associated with procurement of a warrant. The Government argues that the traditional justifications for the warrant requirement are inapplicable in beeper cases, but to a large extent that argument is based upon the contention, rejected above, that the beeper constitutes only a minuscule intrusion on protected privacy interests.... Requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search.”) (emphasis added).
Thus, I conclude that in the absence of binding appellate precedent from the Supreme Court or this Court, law enforcement must — as it has been required to do since the founding of this country — comply with the .warrant requirement of the Fourth Amendment. This is clear and easy to follow. This rule gives police officers not only sufficient discretion, but also sufficient guidance to achieve their objectives.
II. Why Knotts and Karo Do Not Constitute Binding Appellate Precedent
The majority elects to make an alternative holding: that Knotts and Karo are *193 binding appellate precedent.[7] I disagree.
Knotts and Karo stand for two propositions, only one of which the majority has elected to acknowledge. First, in Knotts the Supreme Court held that “[a] person traveling in an automobile on public thoroughfares [generally] has no reasonable expectation of privacy in his movements from one place to another.” Knotts, 460 U.S. at 281, 103 S.Ct. 1081. Second, the Supreme Court stated that there remained the possibility that twenty-four hour, “dragnet type law enforcement practices” could implicate “different constitutional principles.” Id. at 283-84, 103 S.Ct. 1081.
The Supreme Court portended the exact case we have before us now. The Court astutely foretold that improvements in technology that would permit twenty-four hour surveillance (i.e., GPS) might indeed present “different constitutional principles.” Id. And now that this case is before us, the majority ignores this second, critical takeaway from Knotts and misrepresents that it constitutes binding appellate precedent for purposes of permitting a Uams-based good faith exception ruling.
In addition to Knotts’ warning about “dragnet type law enforcement practices,” discussed in more detail below, there are three additional reasons why Knotts and Karo are not binding appellate precedent, contrary to the majority’s insistence: (1) the marked technological differences between beepers and GPS trackers, (2) the placement by police of the beepers inside containers with the consent of the owners in those cases, and (3) the uncertainty in this area of law created by the D.C. Circuit decision, United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010), which preceded the application of the GPS device to the Katzin vehicle.

Technological Differences

Our case concerns a “slap-on” GPS tracker, so called because it magnetically attaches to the exterior of a target vehicle, is battery operated, and thereby requires no electronic connection to the automobile. The tracker uses the Global Positioning System — a network of satellites originally developed by the military — to determine its own location with a high degree of specificity and then sends this data to a central server. This check-and-report process repeats every few minutes (depending on the tracker), thereby generating a highly accurate record of the tracker’s whereabouts throughout its period of operation. The great benefit of such a system — apart from its accuracy — is that anyone with access to the central server can analyze or monitor the location data remotely. These aspects make GPS trackers particularly appealing in law enforcement contexts, where the police can attach a tracker to some vehicle or other asset and then remotely monitor its location and movement.
GPS technology is vastly different from the more primitive tracking devices of yesteryear — “beepers.” Beepers are nothing more than “radio transmitter^], usually battery operated, which emit[ ] periodic signals that can be picked up by a radio receiver.” Knotts, 460 U.S. at 277, 103 S.Ct. 1081. In contrast to GPS trackers, beepers do not independently ascertain their location — they only broadcast a signal that the police can then follow via a corresponding receiver. Moreover, beeper signals are range-limited: if the police move far enough away from the beeper, *194 they will be unable to receive the signal that the unit broadcasts. At bottom, then, beepers are mere aids for police officers already performing surveillance of a target vehicle. Unlike GPS trackers, beepers require that the police expend resources— time and manpower- — to follow a target vehicle physically.
In a Ninth Circuit denial of a petition for rehearing on the GPS question, Chief Judge Kozinski issued a fiery dissent from the denial, accusing the Pineda-Moreno majority of being “inclined to refuse nothing” to the needs of law enforcement. United States v. Pineda-Moreno, 617 F.3d 1120, 1121 (9th Cir.2010) (Kozinski, C.J., dissenting). In his dissent, the Chief Judge noted that GPS devices “have little in common with the primitive devices in Knotts,” in part because, unlike GPS devices, beepers “still require[ ] at least one officer — and usually many more — to follow the suspect.” Id. at 1124. Thus, the dissent noted, while “[y]ou can preserve your anonymity from prying eyes, even in public, by traveling at night, through heavy traffic, in crowds, by using a circuitous route, disguising your appearance, passing in and out of buildings and being careful not to be followed,” there is “no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, never get confused and never lose attention.” Id. at 1126.
As noted above, the Knotts Court specifically indicated that, in contrast to the officers’ limited use of the beeper in that case, more expansive monitoring, (e.g., a “twenty-four hour,” “dragnet type law enforcement practice! ]”) could implicate “different constitutional principles.” Knotts, 460 U.S. at 283-84, 103 S.Ct. 1081. The Supreme Court, in issuing Knotts, did not want the case to stand for the proposition that new technology that allows for more invasive surveillance would automatically be permissible for the same reasons as allowed in Knotts.
In fact, in numerous cases, the Supreme Court and Courts of Appeals have expressed caution about the extension of their holdings regarding the permissibility of certain law enforcement conduct to situations involving future technology. See, e.g., Kyllo v. United States, 533 U.S. 27, 36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (“While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development.”);[8] see also United States v. Garcia, 474 F.3d 994 (7th Cir.2007) (Posner, J.) (echoing the concern expressed in Knotts that it might need to reevaluate its conclusion if faced with a case concerning use of GPS technology for mass surveillance); United States v. Robinson, 903 F.Supp.2d 766, 785-87 (E.D.Mo.2012) (“The need for caution in this age of developing technology should be clear. Other Supreme Court cases,, by their rulings or their language, have given notice that earlier pronouncements may not control when the technology changes or the nature and degree of intrusion changes.”).
Even before Katz, when the Supreme Court articulated the “reasonable expectation of privacy” test, the Supreme Court was balancing the “need for effective law *195 enforcement against the right of privacy” in considering whether a particular situation constituted an exception to the Fourth Amendment’s warrant requirement. Johnson v. United States, 333 U.S. 10, 14-15, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (considering warrantless searches based on probable cause). The law enforcement community should have been on notice that they might not be entitled to use warrant-less twenty-four hour surveillance through the use of new technology.

Consent

Another critical difference between Kñotts and Karo and Katzin is the presence or absence of consent. The majority derisively dismisses this issue as an “elaborate ruse.” Majority Op. at 175. However, the “elaborate ruse” enabled the law enforcement officers to place the beeper into a can of ether, with the can owner’s consent. Karo, 468 U.S. at 708, 104 S.Ct. 3296 (“With Muehlenweg’s consent, agents substituted their own can containing a beeper for one of the cans in the shipment. ...”). Similarly, consent was present in Knotts because law enforcement placed a beeper into a container of chloroform with the consent of the chemical manufacturing company where the suspect purchased the chloroform. Knotts, 460 U.S. at 278, 103 S.Ct. 1081 (“With the consent of the Hawkins Chemical Company, officers installed a beeper inside a five gallon container of chloroform....”).
It is true that both of these cases established the principle that no Fourth Amendment search occurs where officers use beeper-based electronics to monitor an automobile’s movement on public roads because a person has no reasonable expectation of privacy regarding that information. However, neither case addressed the direct installation of a tracking device onto or into a vehicle, as is the case here. First, the defendant in Knotts did not challenge the original installation of the beeper, but only the use of the information that it emitted: See id. at 286, 103 S.Ct. 1081 (“I think this would have been a much more difficult case if respondent had challenged, not merely certain aspects of the monitoring of the beeper installed in the ... container ..., but also its original installation.”) (Brennan, J., concurring); Karo, 468 U.S. at 713, 104 S.Ct. 3296 (“As the [Knotts ] case came to us, the installation of the beeper was not challenged; only'the monitoring was at issue.”).
This distinction is important, particularly in light of Jones’s determination that GPS tracking abridges Fourth Amendment rights on the ground that the installation of the GPS constituted a trespass. Jones, 132 S.Ct. at 949 (“The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a ‘search’ within the meaning of the Fourth Amendment when it was first adopted.”). When Knotts and Karo are applied to Katzin, consent is a critical difference that renders their use as binding appellate precedent doubtful.

Maynard Muddies the Waters

Finally, there is the Maynard decision, which, if the technological differences and consent distinctions were not enough, sufficiently muddied the waters so that law enforcement officers could not know whether the attachment of a GPS device to the undercarriage of a vehicle would violate the Fourth Amendment. In Maynard, the D.C. Circuit split from three sister circuits to hold that prolonged GPS surveillance constituted a search. Maynard, 615 F.3d at 563-65. In so doing, the court rejected the Knotts-based argument that a driver’s movements over the course of an entire month are exposed to the public and therefore do not constitute in *196 formation shielded by the Fourth Amendment. Id. at 560. This decision was rendered four months prior to the agents’ conduct at issue here.
At the same time, the court in Maynard rejected the applicability of the automobile exception to the warrant requirement, holding that while the exception “permits the police to search a car without a warrant if they have reason to believe it contains contrabando it] ... does not authorize them to install a tracking device on a car without the approval of a neutral magistrate.” Id. at 567. A year later, the Supreme Court granted certiorari, under the name United States v. Jones, — U.S. -, 131 S.Ct. 8064, 180 L.Ed.2d 885 (2011) (Jones and Maynard were co-defendants). Maynard thus focused on the quality and quantity of information gathered during the extended surveillance. Maynard, 615 F.3d at 562 (noting that prolonged surveillance, unlike short-term surveillance, exposes “what a person does repeatedly, what he does not do, and what he does ensemble,” revealing more information than an isolated trip).
This case should have given law enforcement pause as to the applicability of Knotts and Karo to the new world of GPS. At the very least, they should have known that prolonged surveillance could be an issue and one that could be easily fixed by getting a search warrant from a neutral magistrate.
By its plain terms, the express holding in Davis is inapposite to this case because I believe that Knotts and Karo do not qualify as appropriate binding appellate precedent. Neither case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver (all with the container owner’s permission). See Karo, 468 U.S. at 708, 104 S.Ct. 3296; Knotts, 460 U.S. at 278, 103 S.Ct. 1081. Additionally, both Karo and Knotts addressed the use of beepers, which—as I have already explained — are markedly different from GPS trackers. See Maynard, 615 F.3d at 556-57.
III. Conclusion
The majority’s good faith analysis is flawed because it finds that, where the law is unsettled, law enforcement may engage in constitutionally reckless conduct and still reap the benefits of the good faith exception. Fourth Amendment jurisprudence dictates a different outcome. When the law is unsettled, law enforcement should not travel the road of speculation, but rather they should demonstrate respect for the constitutional mandate — obtain a warrant. Anything less would require suppression. I cannot condone the majority’s accommodation to law enforcement at the expense of our civil liberties. I am compelled to dissent.

. That the GPS placed on Katzin's vehicle violated his Fourth Amendment rights was not argued before the Third Circuit en banc, as argument was restricted to the question of the applicability of good faith. Before a good faith analysis can proceed, there must first be a finding that a Fourth Amendment violation occurred. The majority downplays the significance of this requirement, noting that “we need not determine whether the agents' conduct was an unreasonable search because, even assuming so, we conclude that the good faith exception applies_" Majority Op. at 170. However, simultaneously, the majority notes that "[a] panel of this Court unanimously affirmed the District Court's conclusions that the agents’ conduct required a warrant and that all three brothers had standing.” Majority Op. at 169. Here, the agents' conduct constituted an unreasonable search, and this finding is a predicate to any good faith analysis. See, e.g., Davis v. United States,-U.S. -, 131 S.Ct. 2419, 2428-29, 180 L.Ed.2d 285 (2011) (acknowledging the constitutional violation before proceeding to the good faith analysis).

. At oral argument, the Government stated that its position regarding United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) is, "about one hair short of [binding appellate precedent].” Tr. of Oral Argument at 6, United States v. Katzin, 769 F.3d 163 (3d Cir.2014) (enbanc) (No. 12-2548).

. At oral argument, the Government acknowledged that it was asking for an expansion of the good faith exception, to which, with today's ruling, the majority has clearly acquiesced. Id. at 23.

. The Eleventh Circuit’s opinion in Davis was also explicit on this point: "[We refuse] to apply the exclusionary rule when the police have reasonably relied on clear and well-settled precedent. We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule’s operation.” Davis, 598 F.3d at 1266 (citations omitted) (emphasis added); see also United States v. Buford, 632 F.3d 264, 276 n. 9 (6th Cir.2011) ("Like the Eleventh Circuit, we also 'stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation.' ” (quoting Davis, 598 F.3d at 1266)); United States v. McCane, 573 F.3d 1037, 1045 n. 6 (10th Cir.2009) (finding that the good faith exception applied because "Tenth Circuit jurisprudence supporting the search was settled. Thus, there was no risk that law enforcement officers would engage in the type of complex legal research and analysis better left to the judiciary and members of the bar”).

. I limit my discussion to scenario (b) based on the facts of this case.

. Johnson addressed retroactive application of Fourth Amendment decisions. In discussing the matter, the Court stated:
If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord any retroactive effect to Fourth Amendment rulings would encourage police or other courts to disregard the plain purport of our decisions and to adopt a let’s-wait-until-it’s-decided approach.
Johnson, 457 U.S. at 561, 102 S.Ct. 2579 (footnote and internal quotation marks omitted).

. While the Supreme Court has leant its imprimatur to alternative holdings, see, e.g., MacDonald, Sommer & Frates v. Yolo Cnty., 477 U.S. 340, 346 n. 4, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), in this instance I believe that the use of an alternative holding emphasizes the majority's dubious faith in their argument that Knotts and Karo constitute binding appellate precedent.

. See also Kyllo, 533 U.S. at 33-34, 121 S.Ct. 2038 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology. For example, as the cases discussed above make clear, the technology enabling human flight has exposed to public view (and hence, we have said, to official observation) uncovered portions of the house and its curtilage that once were private. The question we confront today is what limits there are upon this power of technology to shrink the realm of guaranteed privacy.”) (citations omitted).