# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 19, 2013 Session

## STATE OF TENNESSEE v. CHARLES EDGAR LEDFORD

**Appeal from the Criminal Court for Monroe County**
**Nos. 12064, 12091, and 12092       Amy Reedy, Judge**

**No. E2012-02672-CCA-R3-CD - Filed January 13, 2014**

The defendant, Charles Edgar Ledford, appeals from the Monroe County Criminal Court to challenge via certified questions of law his guilty-pleaded convictions of two counts of sexual exploitation of a minor, *see* T.C.A. § 39-17-1003, a Class D felony; child neglect, *see id.* § 39-15-402(a), a Class E felony; two counts of aggravated sexual battery, *see id.* § 39-13-504, a Class B felony; and two counts of rape of a child, *see id.* § 39-13-522, a Class A felony.  The defendant received an effective sentence of 56 years to be served in the Department of Correction. The certified questions relate to law enforcement officers' discovery and seizure of child pornography materials in the defendant's house, which had been condemned for demolition by the City of Sweetwater.  Upon our review, we hold that the certified questions are not dispositive of some of the convictions, and we dismiss the appeal relative to those convictions.  As to the remainder of the convictions, including those for aggravated sexual battery and rape of a child, we hold that the defendant had no expectation of privacy in the seized materials and that the motion to suppress was properly denied.  Thus, we affirm the trial court's order with respect to these latter convictions.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

C. Richard Hughes, Jr., District Public Defender; and Donald Leon Shahan, Jr., Assistant Public Defender, for the appellant, Charles Edgar Ledford.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Robert Steven Bebb, District Attorney General; and Paul Rush, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The defendant filed a pretrial motion to suppress the following evidence: "all analog or digital recordings or photographs or all other electronic media containing evidence of child pornography or evidence depicting the defendant as engaged in sexual acts with a minor child that was obtained from the residence of [the defendant] located at 199 Oakland Road." The motion alleged that an administrative inspection of the Oakland Road house was unlawful and that the scope of the inspection was exceeded when the officials "inspect[ed] in great detail [the defendant's] personal property to determine if its contents contained what [the officials] believed was pornographic movies." The motion alleged that the city officials knew that the defendant still resided on the property when the inspection and seizures were effected. The motion to suppress further alleged deficiencies in the processes for obtaining post-seizure search warrants. The following summarizes the evidence presented to the trial court in the hearing on the motion to suppress.

Scott Wilson, the City of Sweetwater planner and code enforcement officer, testified that he had received complaints "on the overgrowth of the property and the condition" of the defendant's property on Oakland Road in Sweetwater. As a result, he obtained from the city judge "an administration inspection warrant to review the house and the property." He first entered upon the property on March 7, 2011, and observed "[h]orrible conditions. Hoarding was immense, couldn't walk through the house, couldn't get through the door, couldn't get over things." "It was extremely nasty," he added. He found 18 cars and two campers on the property amid "overgrowth, brush, trash, tents, car parts." He testified that the property "looked like a dump. It was terrible." As a result of Mr. Wilson's findings, the defendant was cited into city court on a "condemnation complaint."

Mr. Wilson testified that he and the defendant attended the hearing on the complaint. Mr. Wilson testified that, because any condemnation decree had to be based upon the cost to bring the house into city code compliance compared to the value of the property, the judge "wanted . . . to have the electrical inspector for the state of Tennessee and a licensed residential contractor to go with [Mr. Wilson] into the home and conduct an inspection." As a result, Mr. Wilson and the two additional inspectors went to the property and found the house in the same condition it was in on March 7. Following the ensuing hearing, the city court on June 20, 2011, found that "the house was unlivable and the judge ordered that it be torn down by the defendant." Mr. Wilson testified that the order provided for the city, if the defendant did not tear down the house within the allotted time, "to go onto the property and do what is necessary . . . to tear it down." Mr. Wilson explained that this type of "condemnation" involved no transfers of title and no taking of the property by the city.

Mr. Wilson testified that the defendant did not tear down the house within the allotted time. Mr. Wilson then cited the defendant back into court to obtain an order for the defendant to clean up the debris outside the house. A hearing was held on October 26, 2011, on this citation, and the city court ordered the defendant to clean up the property within 10 days, and, in the event he failed to do so, the city was ordered to remove the vehicles, trash, and other debris from the property. Mr. Wilson testified that the defendant did not comply with the court's order.

Mr. Wilson testified that the city was "required by state and federal law from the EPA and the Tennessee Department of Environment and Con[serv]ation that we have to perform an asbestos and lead based survey on the residence before demolition." He said that a certified "EPA" inspector came from Knoxville to do an asbestos survey on December 20, 2011. The survey entailed taking samples from the house, including paint samples. Mr. Wilson went to the property with the inspector. He noted that the property was "posted" with a "notice on the door that it was condemned" and that "no one was allowed in or out" other than the property officials. Mr. Wilson testified that the house was unlocked – that, in fact, "there was a door on a hinge that wasn't on a hinge . . . just kind of propped up." Inside the house, the former conditions still prevailed. The inspector tried "to get across all the junk to get to where she can take samples and tests." During the inspection, Mr. Wilson saw x-rated videos "that had obviously graphic pictures of the boxes" that referred to "'Teens'" and "Babysitting.'" Mr. Wilson testified that he then noticed that "hundreds" of such videos were "lying around the house" in plain view. One box was labeled "'School Bus Girls'" and another "'The Babysitter 12.'"

Mr. Wilson then testified that lying next to an area where the inspector was trying to obtain a paint sample was a "container of blank DVD's, the very top one obviously noticeable because of all the other x-rated stuff." He said the "DVD" had a handwritten inscription, "'A Lot of Hanna, Cheerleading, 2011, YMCA,'" or "something like that."

Mr. Wilson testified that, after the inspection was finished, he called the chief of police, who came to the property. Mr. Wilson and/or the chief of police found "handwritten blank DVD's" in "nooks and crannies" that Mr. Wilson had not seen earlier. The chief found money in an unlocked box near the kitchen. Mr. Wilson testified that he saw 20 to 30 video cameras "lying around the house."

Mr. Wilson testified that the house was ultimately demolished and the debris was removed from the property. The city then placed a lien on the property for the costs of the demolition and removal.

During Mr. Wilson's testimony, the State introduced into evidence copies of

the city court opinion, order, and citation to appear; various photographs of the defendant's house; a photograph of "2 VHS sleeves"; a photograph of other "VHS sleeves"; and a photograph of a "[h]omemade DVD."

On cross-examination by defense counsel, Mr. Wilson testified that, before he first discovered the pornographic materials in the house, he had received no information that such materials might be present. He agreed that "anything [in the house] that we deemed of any kind of value was sold at a public auction." The rest of the contents was destroyed. Mr. Wilson testified that he did not watch any of the videos that were found in the house.

Kevin Watson, an investigator for the Sweetwater Police Department, testified that the chief of police called him to come to the defendant's house on Oakland Road. The chief informed Investigator Watson that videos, "hand titled DVD's," and a large amount of cash had been found in the house. Investigator Watson called the district attorney general's office for advice and testified that he was told to "take the videos to the police department but a search warrant would be needed to view the videos." He affirmed that the various boxes bore titles along the lines mentioned by Mr. Wilson. Investigator Watson knew that "Hannah" and "Lolita" are "common name[s] for child pornography over the internet." He said that 15 to 20 of the titles he saw bore the name "Hannah" and about 30 mentioned "cheerleading practices."

After speaking with the district attorney general's office, Investigator Watson spoke with the defendant, "read him his rights," and asked for consent to view the videos. He said that the defendant "denied that consent." However, during questioning, the defendant said that "Hannah" referred to "a girl [who] was on his son's cheerleading team" and that she was "[a]pproximately 10" years old. Investigator Watson then procured a total of four search warrants between December 20, 2011, and January 12, 2012, which he exhibited to his testimony. Based upon the first warrant, Investigator Watson began to view the videos. On some of the "DVD's," Investigator Watson viewed two "12 to 13 year old girls enacting in sexual relations with [the defendant]." One of the girls told the defendant that he could send her flowers at "Niota Elementary School." The officer fixed the date of the acts depicted in the video as circa 1996. In other "DVD's," Investigator Watson viewed scenes of a young girl "performing cheerleading acts," and the camera zoomed in on her "breasts and her backside area." The officer testified that a "DVD" labeled "Loudon Pool" contained footage of a young girl "sitting down in a bathing suit eating a sucker, and it would stay on that for ten or fifteen minutes."

Investigator Watson testified that he collected about 500 to 600 "VHS tapes" and a thousand "DVD's" from the defendant's house.

Investigator Watson then described the scenes depicted on a video entitled "Spank it Hard All Night":

> Whenever the video show started to begin to play there was what looked like to me an 18 month old to a three year old, lying on the floor, without any panties or diaper or anything on, and then the video shows [the defendant] performing oral sex on the child, and then later on shows him with his penis on the child's vagina until he ejaculates . . . [o]n the child.

Investigator Watson then described similar acts perpetrated by the defendant upon the same child, this second time on a bed. In that scene, a small but ambulatory child was seen walking around in the background during the commission of the offense.

Investigator Watson learned that the defendant was residing at 919 Monroe Street in Sweetwater, and after viewing the above videos, he obtained a search warrant for the Monroe Street address. He testified that in executing this second warrant he found some pornographic materials but found nothing "illegal."

As a means of trying to identify the young girls seen in the videos, the police obtained the third search warrant to authorize a further search of the condemned property on Oakland Road. Also, a fourth search warrant was obtained which authorized the viewing of the video materials given to Investigator Watson by the defendant's ex-father-in-law who lived in Etowah, Tennessee. The ex-father-in-law had told Investigator Watson that the defendant had brought "things" to him the previous week and told the ex-father-in-law not to "let anybody see them." Upon getting the fourth search warrant to review these materials, he found a photograph of a six-to-eight-year-old child's vagina.

On cross-examination, Investigator Watson testified that, prior to finding the pornographic materials on the defendant's property, he had received no information that the defendant was engaged in possessing or producing such materials. He testified that the cash found on the premises on Oakland Road totaled about $13,000.

The trial court essentially found that the defendant had no reasonable expectation of privacy in the materials discovered in the Oakland Road house, and it denied the motion to suppress. Following the denial, the parties entered into an open plea agreement, and the defendant reserved the following certified questions of law:

> 1. Whether the initial discovery of the evidence by Sweetwater Codes enforcement was suppressible given the

absence of a search warrant?

        2. Whether the Sweetwater Police Department's search and recovery of the evidence from the Defendant's residence was lawful in the absence of a search warrant?

        3. Whether affidavit [sic] of the Sweetwater Police Department's subsequent search warrant to view the evidence seized was sufficient to establish probable cause for the issuance of the same?

Via an order duly entered, the defendant, the State, and the trial court agreed that the certified questions were dispositive of the case.

Following the acceptance of the defendant's open guilty pleas, the trial court conducted a sentencing hearing. In the hearing, a lady, identified herein as "mother," testified that the infant victim depicted in the "Spank it . . . ." video is her daughter who, at the time of the hearing, was 12 years of age. Mother testified that the defendant is her ex-brother-in-law and that he was the victim's uncle. Mother testified that the victim had been receiving counseling in recent months and had written a response to the presentence investigator's victim impact inquiry. Mother explained that the victim's statement was written by the victim "on her own" and that it said:

> When I was a baby I had been raped. I felt very very sad. I never knew such a person who will do that to a baby. Now I'm very scared of him. I only wish somebody would stop the raping of innocent children to everyone who has been raped.

Following the sentencing hearing, the trial court imposed an effective incarcerative sentence of 56 years. The defendant filed a timely notice of appeal.

This defendant seeks to appeal a dispositive, certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b), which, in pertinent part, provides that a defendant "may appeal from any judgment of conviction . . . on a plea of guilty . . . if . . . the defendant--with the consent of the court--explicitly reserved the right to appeal a certified question of law that is dispositive of the case, and the requirements of Rule 37(b)(2) are met," except the judgment or order reserving the certified question need not reflect the state's consent to the appeal or the state's opinion that the question is dispositive. Tenn. R. Crim. P. 37(b)(2)(D).

As in any other appeal before this court, our first concern is whether this court is authorized to hear the case. Jurisdiction to hear a direct appeal following a guilty plea

generally must be predicated upon the provisions for reserving a certified question of law. "Appeals of certified questions of law run counter to the general rule that a defendant enjoys no right of appeal following a guilty plea." *State v. Festus Babundo*, No. E2005-02490-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Knoxville, May 26, 2006); *compare* Tenn. R. Crim. P. 37(b)(1) *with id.* 37(b)(2). Because of the dispensatory nature of a certified question appeal, our supreme court firmly rejected a rule of substantial compliance, *see State v. Armstrong*, 126 S.W.3d 908, 912 (Tenn. 2003), and instead demanded strict adherence to Rule 37(b). *State v. Pendergrass*, 937 S.W.2d 834, 836-37 (Tenn. 1996).

A basic requirement for a certified question appeal is that the question actually be dispositive of the case. "Despite that [a] defendant complied with Rule 37(b)(2)(i) . . . and thereby effectively reserved an appellate issue that the court and the parties below deemed to be dispositive of the case, we must nevertheless determine that the issue is, indeed, dispositive." *State v. Gregory W. Gurley*, No. W2001-02253-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Jackson, Aug. 6, 2002); *see also State v. James O. Gambrell, Sr.*, No. 01C01-9603-CR-00123, slip op. at 4-5 (Tenn. Crim. App., Nashville, May 7, 1997) ("Satisfaction of the technical requirements does not ensure review by an appellate court. Appellate review of a properly certified question of law is permitted only when the certified question addresses a dispositive issue, [and a]n appellate court is not bound by the trial court's determination that an issue is dispositive."). Essentially, then, "the reviewing court must make an independent determination that the certified question is dispositive." *State v. Dailey*, 235 S.W.3d 131, 135 (Tenn. 2007).

The State agrees that the defendant in the present case has met the requirements for appealing his certified questions of law with respect to one conviction of sexual exploitation of a minor (case number 12064) that was based upon "multiple recordings of child pornography collected" from the house at 199 Oakland Road.

With respect to the second conviction of sexual exploitation of a minor (case number 12092), the State says the charge was based upon the material received from the defendant's ex-father-in-law. We agree that the defendant's certified questions, which relate to materials found at 199 Oakland Road, do not implicate the conviction emanating from the materials presented by the ex-father-in-law. We hold that we have no jurisdiction to entertain the appeal in that conviction, and the appeal thereof is dismissed.

With respect to the conviction of child neglect (case number 12091), the State says the basis for the neglect was the dangerous or insalubrious condition of the property at 199 Oakland Road and that the certified questions do not address this issue. We agree. We hold that we have no jurisdiction to entertain the appeal in that conviction, and the appeal

thereof is dismissed.

With respect to the two convictions of rape of a child and the two convictions of aggravated sexual battery (case number 12064), which are predicated upon the defendant's actions as depicted in the "Spank it . . . ." video, the State claims that other evidence of the offenses exists – that "the victim could testify to those events." Elaborating in its brief, the State says:

> While she was very young at the time of the offenses and while that certainly might serve as a basis at trial to challenge the credibility of her testimony, there is no reason to conclude under this record that she could not testify about the offenses perpetrated against her. During the sentencing hearing, a handwritten statement from the victim was presented about what the defendant did and its impact on her. This other proof beyond the recording exists to establish the defendant's guilt to those four offenses.

"An appellate court's duty is to determine whether the certified question is dispositive *on the record before it*." *Dailey*, 235 S.W.3d at 135 (emphasis in *Dailey*). In *Dailey*, the supreme court listed a number of cases in which the appellate court held that the certified question was not dispositive of the case, *see id.* at 135-136, but "[i]n each of these cases," the court said, "the certified question was determined to be not dispositive because the record before the appellate court demonstrated that the prosecution had evidence not challenged by the certified question that could be used to prosecute the defendant," *id.* at 136. In *Dailey*, the supreme court held that the admissibility of the defendant's confession was a dispositive issue in his certified-question appeal, despite that the record suggested possibilities for pursuing other evidence.

In the present case, an order signed by the prosecutor and defense counsel and executed by the trial judge was entered to memorialize the certified questions. The order recites, "The State, Court, and Defendant agree that the certified questions are dispositive of the case." Against the backlight of the State's view of the evidence at the time the order was executed, we examine the statement attributed to the victim, noting that she did not testify before the trial court. The statement expresses only the victim's awareness, at the time the statement was made, that she had been the victim of rape; the statement does not express, however, the victim's memory of the sexual offenses. We conclude, on the record and the facts of this case, that the existence of evidence of the offenses other than the inculpative video is only a mere possibility, an avenue that might be explored but that was not developed into fruition upon the record in this case. Thus, we hold that the certified questions are

-8-

dispositive of the rape of a child and aggravated sexual battery convictions in case number 12064.

Therefore, at this juncture, we review the claims of inadmissible evidence with respect to the convictions of sexual exploitation of a minor, rape of a child, and aggravated sexual battery, all charged in docket number 12064. To review, the certified questions are:

> 1. Whether the initial discovery of the evidence by Sweetwater Codes enforcement was suppressible given the absence of a search warrant?
> 2. Whether the Sweetwater Police Department's search and recovery of the evidence from the Defendant's residence was lawful in the absence of a search warrant?
> 3. Whether affidavit [sic] of the Sweetwater Police Department's subsequent search warrant to view the evidence seized was sufficient to establish probable cause for the issuance of the same?

The evidence referenced in the questions all derived from the discovery and seizure of materials from the property located at 199 Oakland Road. The trial court held that the defendant enjoyed no reasonable expectation of privacy in these materials. For the reasons explained below, we agree with the trial court and hold that the defendant had no reasonable expectation of privacy with respect to the evidence that was seized from the property at 199 Oakland Road.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).

These constitutional protections, however, "'are personal in nature, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *State v. Cothran*, 115 S.W.3d 513, 520 (Tenn. Crim. App. 2003) (quoting *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001)). Therefore, "[i]n order to challenge the reasonableness of a search or seizure, the defendant must have a legitimate expectation of privacy in the place or thing to be searched." *Id.* at 520-21; *see Katz v. United States*, 389 U.S. 347, 357 (1967); *see also State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987) (stating that Tennessee affords no greater protection than *Katz*'s principle of what a person knowingly exposes to the public). To properly evaluate the issue under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and [if so] (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001)). The second part of this inquiry focuses on "whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 357).

Thus, the idea that property interests control the right of officials to search and seize has been discredited. *See Oliver v. United States*, 466 U.S. 170, 183 (1984); *Katz*, 389 U.S. at 353. The Fourth Amendment protects people and privacy, not places and property. *See Katz*, 389 U.S. at 351. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351. Importantly, a "person can lose his reasonable expectation of privacy in his real property if he abandons it. Thus, a person can, as he can with any other property, sufficiently manifest an intent to abandon his house." *United States v. Harrison*, 689 F.3d 301, 307-08 (3d Cir. 2012). "Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)). Consequently, "abandonment," as understood in the constitutional context of unreasonable searches and seizures, "is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search." *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1981).

In the present case, the City of Sweetwater initiated a legal process to enforce its ordinances relative to public health and safety. Based upon complaints about the defendant's property at 199 Oakland Road, the process began with the issuance of an

administrative inspection warrant and the resulting discovery of the unsanitary and unsafe condition of the property, and it entailed citing and giving notice to the defendant to appear in city court on a condemnation complaint. On March 7, 2011, the defendant attended the hearing on the complaint, which resulted in the city court's ordering an additional inspection of the property to determine the economic feasibility of repair. The court conducted a further hearing on June 20, 2011, which resulted in an order for the defendant to demolish the house on the property within 30 days, and the defendant failed to act. The city also cited the defendant back into court to obtain an order for the defendant to clean up the debris outside the house. After the October 26, 2011 hearing on this citation, the city court ordered the defendant to clean up the property within 10 days. The defendant did not comply with this order. On December 20, 2011, the city conducted an environmental inspection prefatory to having the house demolished per the court's order, and the evidence was discovered and seized at this time.

During the pendency of the proceedings in city court, notice of the city's pending action was posted on the house. During this time, the door to the house not only was unlocked but was unattached to the door frame.

The defendant challenges neither the city's power to undertake the process to clean up the property and demolish the house nor the legitimacy and efficacy of its procedures, including the issuance of legal process and notices, to exercise that power.

We note that the process that authorized the city to demolish the defendant's house began on March 7, 2011, and continued through the discovery of the contraband on December 20, 2011, a period of more than nine months. During this time, despite being informed of the city's ongoing efforts to demolish the house, the defendant made no discernible effort to secure, seclude, or remove the contents of the house. Much of the contraband seized by the officers was in plain view to anyone entering the house, and its nature was obvious. We note that, after the contraband was seized, the city sold the contents that had redeemable value and destroyed the rest. "A person can, through his own acts or omissions, manifest an intent to relinquish his legitimate expectation of privacy in his real property . . . ." *Harrison*, 689 F.3d at 309. We conclude that the defendant here did just that. The record establishes that the defendant knowingly exposed the illicit materials to anyone entering the house, including city officials who entered the house upon legal process, and that he abandoned this property, leaving it to the whim of anyone entering the house. We hold, therefore, that the defendant had no reasonable expectation of privacy in the house or in these materials. Consequently, no search occurred for constitutional purposes, and the seizure of evidence from the house on December 20, 2011, or thereafter, was not violative of the defendant's constitutional rights.

-11-

This determination resolves not only the defendant's first two certified questions, but also the third question which relates to the legality of the first search warrant which authorized the police to view the images on the seized video materials. For the reason explained below, we conclude that, because of the abandonment of the materials and the resulting rightful possession of the materials by the police, we pretermit the third question that challenged the validity of the first search warrant.

The viewing of the images preserved on the various video articles did not violate the defendant's constitutional rights because, as noted above, the defendant reliquished any expectation of privacy in the materials by abandoning them. The city and its police officers legally acquired the contraband materials via the defendant's abandonment and relinquishment of the same. Having obtained lawful possession through the defendant's abandonment, they were not constrained to obtain a warrant for the eventual viewing of the images. As such, the warrant was superfluous, and we need not examine its efficacy. The facts of this case differ from *Walter v. United States*, 447 U.S. 649, 656 (1980), where the Supreme Court held that officers should have obtained a warrant to screen pornographic films that had legally come into their possession via a third party. In *Walter*, a package containing pornographic films was misdelivered and subsequently opened by persons other than the intended recipient. *Walter*, 447 U.S. at 651. The unintended recipient then turned the films, whose pornographic nature was obvious from their covers, over to agents of the Federal Bureau of Investigation ("FBI"), and those agents viewed the films without obtaining a search warrant. *Id.* at 651-52. The Supreme Court found that the FBI had lawfully acquired possession of the films but that, because the possession was predicated upon a private-party search for which there is no Fourth Amendment protection, the agents could not go any further than the initial private-party search. *Id.* at 656 ("[T]here was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties."). Because the unintended recipient had not actually viewed the films, the agents could not do so without obtaining a warrant. *Id.* at 658-59.

In this case, however, the justification for the State's lawful acquisition was not a private-party search but was instead the defendant's abandonment of the property. In consequence, the Fourth Amendment placed no limitation on the State's use of the property. *See California v. Greenwood*, 486 U.S. 35, 40 (1988); *Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of such abandoned property."); *Fulani*, 368 F.3d at 354.

In conclusion, the appeals of the following convictions are dismissed: sexual exploitation of a minor (case number 12092) and child neglect (12091). We affirm the trial court's order of suppression, and hence the convictions, for the following counts in case

-12-

number 12064:  sexual exploitation of a minor, two counts of child rape, and two counts of aggravated sexual battery.

_____

JAMES CURWOOD WITT, JR., JUDGE