

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2016 Session

## STATE OF TENNESSEE v. JOSEPH DURWARD WATSON II

**Appeal from the Circuit Court for Blount County**
**No. C-22828      David Reed Duggan, Judge**

_____

**No. E2016-00105-CCA-R3-CD**

_____

The Defendant, Joseph Durward Watson II, was charged with possession with the intent to sell more than one-half ounce but less than ten pounds of marijuana. *See* T.C.A. § 39-17-417 (2014). He filed a motion to suppress the evidence recovered from the search of the home in which the marijuana was found. The trial court granted the motion, determining that the police exceeded the scope of a levy issued for the collection of unpaid court costs and fines. On appeal, the State contends that the trial court erred by granting the motion to suppress because the Defendant disclaimed any expectation of privacy in the home, depriving him of standing to challenge the search. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. TIMOTHY L. EASTER, J., filed a dissenting opinion.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Mike L. Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellant, State of Tennessee.

Nathaniel H. Evans (on appeal and at hearing), Knoxville, Tennessee, and Joe Costner (at hearing), Maryville, Tennessee, for the appellee, Joseph Durward Watson II.

### OPINION

On July 7, 2014, the Defendant was indicted for possession with intent to sell more than one-half ounce but less than ten pounds of marijuana.[1] The Defendant filed a

_____

[1] The record reflects that the Defendant was charged in two additional cases and that at least one of those cases arose from a subsequent search of the same home during which additional marijuana was

motion to suppress the drug-related evidence seized at a home on December 20, 2013, that led to the charge in the present case.

At the hearing, Blount County Sheriff's Investigator David Mendez testified that he was assigned to the Fifth Judicial District Drug Task Force. On December 20, 2013, he was assigned to serve a levy on the Defendant for unpaid court costs and fines from a previous case. Investigator Mendez explained that it was not uncommon for deputies in the Drug Task Force to execute levies for unpaid court costs and fines from drug-related cases. He acknowledged the sheriff's department had received a complaint, alleging the Defendant was selling narcotics out of his home, before the levy was obtained.

Investigator Mendez testified that he and Sheriff's Deputy Pearson went to the Defendant's home to serve the levy and that at some point, Chief Ron Talbott arrived at the home. Investigator Mendez stated they walked onto the front porch and knocked on the door for several minutes. When nobody opened the door, the deputies stepped away from the door and checked the registration of two vehicles parked in the driveway. Investigator Mendez stated that the Defendant walked out of the home and that Investigator Mendez explained they were there to serve a civil levy and how a civil levy worked. Investigator Mendez said that he asked the Defendant if he had anything of value in his pockets and that the Defendant emptied some loose change from his pockets. Investigator Mendez stated that they "asked" the Defendant "that we needed to get in his residence to execute the levy." Investigator Mendez said the Defendant responded that he did not live there, that the home belonged to his girlfriend, that the front door locked automatically when he left the home, and that "he left his keys inside." Investigator Mendez said that the Defendant asked if he was free to leave and that the deputies allowed him to leave without incident. The Defendant left on foot.

Investigator Mendez testified that when he spoke to the Defendant, a deputy was attempting to obtain records showing the Defendant lived at the home because the deputies believed the Defendant was lying. Investigator Mendez noted the sheriff's department had information that the Defendant lived there. After the Defendant left, the deputies knocked on the front door again because Investigator Mendez said the Defendant stated that his girlfriend was inside the home. Investigator Mendez said that nobody came to the door, that the deputies "walked down the side of the house, looking for . . . [personal] property to . . . satisfy the levy," and that the deputies smelled marijuana coming from the crawl space vent. Investigator Mendez said that he walked to

discovered. The suppression hearing transcript reflects that the trial court understood the motion was relevant to all three of the Defendant's cases. Although the trial court's order granting the motion to suppress reflects three circuit court docket numbers, the court's order of dismissal only reflects the docket number associated with the initial search. Likewise, the appellate record only contains a single judgment form, reflecting a dismissal in the docket number associated with the initial search.

the deck and looked through a window to determine if anyone was inside the home, that he did not see anyone inside, and that he smelled marijuana coming from the nearby crawl space vent. Investigator Mendez said that he and the deputies returned to the front of the home and knocked on the door a third time. Investigator Mendez said that he saw partially smoked marijuana cigarettes in an ashtray on the front porch and that he obtained and executed a search warrant that afternoon.[2] He said several pounds of high-quality marijuana were found inside the home.

On cross-examination, Investigator Mendez denied that he was instructed to look for drug activity at the Defendant's home when attempting to execute the levy and that he was only there to collect money or personal property for the levy. He admitted, though, that he had information that the Defendant was selling drugs and that he thought he might find something illegal. Investigator Mendez maintained that the purpose of serving the levy was not to investigate the Defendant or to "look[] for a reason to get a search warrant."

Investigator Mendez testified that two vehicles in the driveway were not registered to the Defendant, although the Defendant had been seen driving one of them. He denied drugs were found inside the crawl space. He said that he initially knocked on the front door for twenty minutes, that he looked through the front-porch window, and that he did not see anything. Investigator Mendez denied that he patted down the Defendant and said that he did not take the change from the Defendant's pants pockets because it amounted to less than one dollar. Investigator Mendez said that the levy was never served upon the Defendant and denied that the Defendant advised he intended to pay his outstanding fines and court costs immediately.

Investigator Mendez testified that the Defendant stated that the home did not belong to him, that his "keys" were inside the home, and that his girlfriend was inside the home. Investigator Mendez said that he checked to determine whether the front door was locked after the Defendant left on foot. Investigator Mendez estimated that he was three feet from the crawl space vent when he smelled marijuana.

Blount County Circuit Court Clerk Tom Hatcher testified that his office had established a collections department in an effort to collect outstanding ligation taxes, court costs, and fines owed by criminal defendants and that levies and garnishments were used to collect the outstanding debts. He stated that the Defendant pleaded guilty and

---

[2] The search warrant and affidavit were received as exhibits at the suppression hearing but were not included in the appellate record. This court granted the State's motion to supplement the record, in relevant part, with the exhibits received at the hearing. The supplement to the record did not include the exhibits. *See* T.R.A.P. 24(a) (stating it is the appellant's responsibility to ensure the record on appeal includes items "sufficient to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of [the] appeal"); *see also State v. Caudle*, 388 S.W.3d 273 (Tenn. 2012).

received an effective six-year sentence in November 2003. Mr. Hatcher said that although the Defendant's sentences had expired, the Defendant owed approximately $3000 in court costs and fines. Mr. Hatcher stated that at the expiration of a criminal sentence, his office was permitted to collect any unpaid fines and court costs as a civil judgment by establishing a payment plan, garnishing wages, or issuing a levy. Mr. Hatcher testified that the levy issued in this case was in accordance with the policies of his office but that the sheriff deputy's return stated the levy was not executed.

On cross-examination, Mr. Hatcher testified that unpaid debts were considered civil judgments after the trial court lost jurisdiction at the expiration of a criminal sentence. Upon questioning by the trial court, Mr. Hatcher stated that law enforcement officers contacted his office, requesting that a deputy clerk determine if the Defendant owed money relative to the 2003 convictions. Mr. Hatcher said the request was not unusual. Upon further cross-examination, Mr. Hatcher testified that Defendant paid his debt within one day of the issuance of the levy.

Blount County Sheriff's Deputy Chief of Investigations and Fifth Judicial District Drug Task Force Director Ron Talbott testified that the Task Force received several complaints of heavy traffic at the home at issue in this case in November and December 2013, that "utility records" showed the Defendant lived at the home, and that Chief Talbott learned various police informants had purchased drugs from the Defendant "in the past." Chief Talbott said that he learned the Defendant had unpaid fines from previous criminal cases, that the court clerk's office was contacted about the debt, and that a levy was issued. Chief Talbott stated that levy executions were not done daily but that the Drug Task Force executed levies against criminal defendants who owed fines. Chief Talbott explained that the Drug Task Force received a portion of the collected fines in drug-related cases.

Chief Talbott testified that when he arrived at the Defendant's home, deputies were present and knocking on the front door. He said that the deputies met him in the driveway and that the deputies believed someone was inside the home because of noise coming from inside. Chief Talbott said that the Defendant came out the front door and walked toward the deputies and that the Defendant said he did not live there, the door was locked, and "his keys were inside." Chief Talbott said the Defendant stated that the home belonged to his girlfriend. Chief Talbott said that the Defendant was asked if he had anything of value on him, that the Defendant only had loose change, and that the Defendant was told he was free to leave.

Chief Talbott testified that he found the encounter with the Defendant suspicious, that the deputies knocked on the front door again, and that he walked down the driveway toward the back of the home to find anything of value. Chief Talbott described the home as "a rancher-style . . . located on a very tall crawl space." He estimated that the crawl

space was about six feet tall on the driveway side of the home, placing the vents at eye level. Chief Talbott said he smelled unburned marijuana through the crawl space vents on the side and back of the home. He said that he and Investigator Mendez discussed the odor of marijuana and the discovery of partially smoked marijuana cigarettes on the front porch and that they left to obtain a search warrant. Chief Talbot said that during the execution of the search warrant, marijuana was found in a bathroom on the back of the home, located just above the crawl space vents. He said that during the search, a woman presented a receipt showing that the Defendant's court debt had been paid in full after the Defendant left the home.

On cross-examination, Chief Talbott testified that after the Drug Task Force received its initial complaints about heavy traffic at the Defendant's home in November, deputies began speaking with informants to determine if anyone had made hand-to-hand drug transactions with the Defendant. He said that the utility records for the home were also investigated and that he learned the Defendant had outstanding fines in an unrelated drug case. Chief Talbott said that the Drug Task Force received multiple complaints between November 18, and December 20, although the complaints were not documented due to time constraints and because some of the complaints were duplicative. He said that he received two complaints regarding heavy traffic before 10:00 p.m. at the Defendant's home, a complaint regarding the occupants' smoking marijuana on the front porch, and a complaint regarding the occupants' yelling obscenities. Chief Talbott said that he was five feet from the crawl space vent when he smelled marijuana but that he did not gauge the distance at which the odor dissipated. Chief Talbott agreed that while serving a levy, he was not permitted to break into someone's home.

The Defendant attempted to call an expert witness to dispute whether the deputies could smell marijuana from outside of the home. The State objected because the witness had been inside the courtroom throughout the proceedings despite the invocation of the sequestration rule. *See* Tenn. R. Evid. 615. The trial court stated that whether the officers could smell marijuana was not dispositive to the case, and the court prohibited the expert testimony. *See* Tenn. R. Evid. 702.

Blount County Sherriff's Investigator Rusty Aycocke testified for the defense that he remembered discussing complaints about the Defendant's selling marijuana during at least one or two Drug Task Force staff meetings in the fall of 2013. Investigator Aycocke said that he spoke to his confidential informants to determine whether they had information about the Defendant. Investigator Aycocke said he arrived at the Defendant's home after the search warrant had been executed.

The Defendant testified that he lived with his then-girlfriend, Monique Ayala[3], and their daughter at the home at issue in this case and that he stayed overnight at the home the night before the deputies searched it. He said that in December 2013, he attended school and stayed overnight at the home three or four nights per week, that he "had some clothes there," and that "we [were not] in there too long." He said that he owned and possessed keys to the home.

On cross-examination, the Defendant testified that he did not immediately answer the door when the deputies knocked because he was asleep. He agreed he eventually left the home and spoke with two deputies, who told him he was not under arrest and was free to leave. The Defendant said that he did not fully understand why the deputies were there because he had "just paid on the fines," although he had not paid the full balance. He said, though, his mother paid the full balance before the deputies entered the home.

The Defendant testified that he and his wife were joint owners of the home but clarified that they "rented to own" the home in February 2014, which was when the second search warrant was issued. He said that he and his wife had moved into the home about two months before the initial search but that he did not "stay[]" there much because of school and because he "was helping" his mother. He said that he kept clothes and music recording equipment inside the home and that he could not recall any additional possessions he kept there. He said the majority of the household items belonged to his wife. He said that the marijuana and paraphernalia found during the search belonged to him.

The trial court granted the Defendant's motion to suppress the evidence and ultimately, dismissed the charge relative to the initial search. Relative to whether the Defendant had standing to challenge the search of the home, the court noted the State's reliance on *State v. Ross*, 49 S.W.3d 833 (Tenn. 2001), in arguing that the Defendant lacked standing because he lied when he said he did not live at the home. The court determined that although *Ross* was instructive, the facts underlying our supreme court's determination that the defendant in *Ross* disclaimed all privacy interests in the area to be searched were distinguishable from the present case. The court found that the Defendant said that it was not his home and that it was his girlfriend's home. The court also found that the Defendant said that the door was locked, that he had a key, that he left "it" inside the home, and that he could not reenter the home. The court determined that the Defendant had standing to challenge the search.

---

[3] Ms. Ayala was indicted as a codefendant in one of the Defendant's additional cases. Although her attorney participated in the suppression hearing, the record does not reflect that her attorney argued the evidence in the present case should have been suppressed in her related case. The trial court's orders do not reflect the docket number of Ms. Ayala's case.

The trial court initially found after reviewing the statute that no valid civil judgment upon which to levy existed because pursuant to the Tennessee Rules of Civil Procedure, unpaid fines and court costs did not automatically become a civil judgment without "some procedure whereby they are converted to a judgment." Alternatively, the court found that even if a valid levy existed, the deputies had suspicions of criminal activity and used the levy as a pretext to gain access to the property in order to establish probable cause for a search warrant. The court expressed concern that levies were being used to circumvent the establishment of probable cause and warrant requirements and found that such use of a civil levy was improper. The court noted a distinction between using a legitimate reason, such as a broken taillight, as a pretext to initiate a traffic stop on a public roadway and a place "where the officer does not have a right to be," such as a person's private property.

The trial court found that if the levy were properly obtained and valid, the deputies would have been permitted to knock on the front door and speak with anyone who opened the door. The court found that the Defendant eventually emerged from the home, that the deputies asked him to empty his pockets, and that the deputies briefly spoke to the Defendant. The court found that although the levy was issued against the Defendant, the Defendant identified the home as his girlfriend's home, and that when the Defendant left the property, the deputies remained on the property, looked through the windows, and walked around the curtilage of the property. As a result, the court determined that the deputies exceeded the scope of executing the levy when the deputies entered the curtilage after the Defendant, the subject of the levy, left the property. The court noted that the Defendant was not served with the levy before leaving the property and that the return stated the levy was not served. The court determined that any effort to execute the levy when it was left unserved upon the Defendant was "for naught."

On October 26, 2015, the trial court entered an amended order regarding its findings relative to whether the outstanding fines and court costs owed by a criminal defendant automatically converted to a civil judgment. The court stated that it had determined based upon relevant case law that criminal court judgments ordering the payment of fines and costs were treated as if they automatically became a civil judgment without any additional action. The court found that the deputies had obtained a valid levy but reaffirmed its remaining findings based upon of the facts of this case that the deputies improperly used the levy to gain access to the Defendant's property and exceeded the scope of the levy by entering the curtilage. On December 21, 2015, the trial court entered an order dismissing the case. This appeal followed.

The State contends that the trial court erred by granting the Defendant's motion to suppress the evidence from the home. Although the State does not argue that the Defendant did not possess a reasonable and legitimate expectation of privacy inside the home, it continues to rely on *Ross* in arguing that because the Defendant disclaimed and

abandoned his privacy interest in the home, he has no standing to assert a privacy interest and a violation of his Fourth Amendment rights as a result of the search. The Defendant responds that the trial court properly determined the Defendant had standing to challenge the search.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures. The Tennessee Supreme Court has interpreted the two provisions to be identical in intent and purpose. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression" unless conducted pursuant to one of the exceptions to the warrant requirement. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). However, "the state and federal constitutional protections 'are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen.'" *Ross*, 49 S.W.3d at 839 (quoting *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000)). The United States Supreme Court has "define[d] a search as an invasion of a reasonable or legitimate expectation of privacy." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Therefore, "an investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion or a search warrant." *Id*. (quoting *State v. Bell*, 832 S.W.2d 583, 589-90 (Tenn. Crim. App. 1991)).

Fourth Amendment rights are personal in nature and "may not be vicariously asserted," *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)), but "may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure."

*Simmons v. United States*, 390 U.S. 377, 389 (1968). "The 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'" *State v. Willis*, 496 S.W.3d 653, 720 (Tenn. 2016) (quoting *Rakas*, 439 U.S. at 143); *see also State v. Cothran*, 115 S.W.3d 513, 520-21 (Tenn. Crim. App. 2003). "One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched." *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982)). In determining whether an individual's Fourth Amendment rights have been infringed, we must determine "(1) whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Ross*, 49 S.W.3d at 840 (internal quotations omitted) (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring) and *Bond v. United States*, 529 U.S. 334, 338 (2000)).

Because the Fourth Amendment protects people and privacy rather than places and property, "[a]ctual ownership or possession of the place or thing searched is alone insufficient to manifest a subjective expectation of privacy." *Ross*, 49 S.W.3d at 840-41 (citing *United States v. Salvucci*, 448 U.S. 83, 91 (1980)). Therefore, courts will "look to a variety of factors to determine whether an 'individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by a warrant.'" *Id*. at 841 (quoting *Oliver v. United States*, 466 U.S. 170, 177-78 (1984)). Our supreme court has recognized a "list of specific factors relevant to such an inquiry," adopted by this Court in *State v. Turnbill*, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982). *Ross*, 49 S.W.3d at 841 (noting that the seven *Turnbill* factors appear to apply a totality-of-the-circumstances approach).

However, a defendant's disclaimer of ownership "is more than just another factor to consider" in evaluating his or her subjective expectation of privacy. *Id*. Our supreme court has held that "a disclaimer or denial of ownership demonstrates sufficient intent of disassociation to prove abandonment." *Id*. at 842 (internal quotation omitted). Like abandonment, a disclaimer of ownership is tantamount to a declaration of indifference, thus negating the existence of any privacy concern. *See United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994). "[W]hen a defendant disclaims an interest in the object of a police investigation at the time of the search, . . . this fact alone will deprive a defendant of any expectation of privacy, irrespective of considerations such as ownership or possession." *Ross*, 49 S.W.3d at 841 (citing *Miller v. State*, 520 S.W.2d 729, 733-34 (Tenn. 1975)). Therefore, "'when one disclaims interest in the premises or possessions searched or in the articles seized[,] he cannot question the legality of the search and seizure.'" *Id*. (quoting *Bowman v. State*, 362 S.W.2d 255, 257 (Tenn. 1962)).

In *Ross*, the police traveled to a motel to speak with a woman regarding stolen checks and were advised which room the woman had rented. The police knocked on the door to the motel room and smelled the odor of marijuana when the door opened. Four people were inside the room, including the defendant, and the police requested that everyone leave the room and empty their pockets. The police requested that the defendant remove his shoes, and he removed a motel key to room 132 from a sock and held the key in his hand. The police saw the key and asked the defendant if the key belonged to him. The Defendant said that the key did not belong to him and that the key belonged to Safron Black, who had also been inside the room with the defendant. The police asked Ms. Black if the key from the defendant's sock belonged to her, and she denied ownership of the key but told the police they could search anything that belonged to her. The police searched room 132 and found a large amount of crack cocaine, drug paraphernalia, the defendant's wallet, and two car titles and a receipt reflecting the defendant's name. The defendant sought to suppress the evidence found inside motel room 132 because the police did not have a search warrant and did not have probable cause to believe illegal items were inside the room. *Ross*, 49 S.W.3d at 837-38.

Our supreme court concluded in *Ross* that although an objective and reasonable expectation of privacy exists inside a motel or hotel room, a person may disclaim an interest in the object or place to be searched by the police. *Id*. at 841-42. The court determined that the defendant in *Ross* disclaimed an interest in the motel room and that his disclaimer alone without consideration for other factors resulted in the loss of his subjective expectation of privacy in the room. *Id*. at 842. The court reasoned that the defendant's stating that the key did not belong to him but belonged to another identified person was a disclaimer of ownership of the key and that the disclaimer was sufficient to establish that the defendant abandoned his reasonable expectation of privacy in the room. *Id*. at 842-43. The court noted that the defendant's voluntarily relinquishing the key to the police resulted in the defendant's relinquishing his ability to exclude others from the room and that the right to exclude others was a critical factor in establishing a legitimate expectation of privacy. *Id*. at 843 (citing *United States v. Torres*, 949 F.2d 606, 608 (2nd Cir. 1991)); *see Turnbill*, 640 S.W.2d at 46 (holding that one factor in determining whether an individual has a subjective expectation of privacy is "whether he has the right to exclude others from that place"). The court determined that a defendant may not claim a privacy interest in an area to be searched "after surrendering his or her ability to control who could have access" to the area. *Id*. at 843. Therefore, the court concluded that "while the evidence . . . reflects that the appellant had an actual possessory interest in the motel room and its contents . . . the record is also clear that he abandoned any privacy interest in the room when he relinquished his right of exclusion." *Id*. at 844.

As a preliminary matter relevant to whether the Defendant had standing to challenge the search of his home, the Defendant argues that *Ross* is distinguishable from the present case because the property disclaimed in *Ross* was a motel room, not a home,

and that that "[i]t goes against common sense to assert that a person could disclaim an interest in his or her own home." However, abandonment of an objective, reasonable, and legitimate privacy interest in a particular location pursuant to the Fourth Amendment differs from abandonment under property law. *Id.* at 842; *see also United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1981) (holding that abandonment in the constitutional context "rests . . . on whether the person . . . relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search"). "[A] person can, as he can with any other property, sufficiently manifest an intent to abandon his house." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012); *see State v. Ledford*, 438 S.W.3d 543, 553-54 (Tenn. Crim. App. 2014) (holding that the defendant manifested an intent to abandon his home by failing to comply with court orders under public health and safety ordinances). "Therefore, the fact that for common law purposes real property cannot be abandoned is not dispositive." *Harrison*, 689 F.3d at 307. Whether the location of the search was a home or a motel room is inconsequential to this case because our courts have established that both areas involve a reasonable and legitimate objective expectation of privacy. The critical inquiry is whether the Defendant subjectively disclaimed his reasonable and legitimate expectation of privacy in the home.

Relative to the trial court's findings regarding the Defendant's keys, we note that the record reflects that when the deputies attempted to execute the levy, the Defendant left the home and spoke to the deputies in the driveway. Although the Defendant told the deputies that he did not live at the home and that the home belonged to his then-girlfriend, the Defendant said that his keys were locked inside the home when the deputies stated that they needed to get inside to execute the levy. The trial court determined that the Defendant was unable to reenter the home because his house key was locked inside, which was a reasonable and legitimate inference to draw from the evidence. Although the State might disagree with the trial court's inference that the keys referred to by the Defendant were to the home, as opposed to the vehicles parked in the driveway, the trial court's inference is a legitimate view of the evidence and supported by the record. The record does not reflect that the Defendant's keys did not include a key to the home, and no evidence shows the deputies inquired about it. Furthermore, the Defendant was never asked whether he had property inside the home upon which to levy, although he was the subject of the levy, and the levy was never served upon the Defendant. Therefore, the record does not preponderate against the court's findings in this regard, and the court's findings are conclusive on appeal.

In any event, we conclude that *Ross* is distinguishable from the present case. The defendant in *Ross* relinquished his motel room key to the police and told the officers that the key belonged to another person. Our supreme court reasoned that these two facts considered together were the critical conduct in determining that the defendant had disclaimed or abandoned his reasonable expectation of privacy in the area searched.

*Ross*, 49 S.W.3d at 842-43. The court reasoned that the defendant's voluntary relinquishment of the key resulted in his inability to exclude others from the room, which was critical to establishing a subjective expectation of privacy. *Id*. at 843; *see Turnbill*, 640 S.W.2d at 46; *see also United States v. Ferguson*, 33 F. App'x 849, 850 (9th Cir. 2002) (stating that the defendant "no longer retained a reasonable expectation of privacy at the time of the search" when the defendant said the home and its contents belonged to another person, produced identification listing his address in another city, and drove away from the scene). We note that the defendant's stating the motel room did not belong to him was not alone dispositive to whether the defendant had disclaimed his privacy interest in the room, although it was a relevant fact.

In contrast, the Defendant in the present case did not surrender any authority to exclude others from the home. Although he stated that the home belonged to his then-girlfriend, the Defendant said his keys were locked inside the home when the deputies told the Defendant that they "needed to get [inside the home] to execute the levy." The Defendant did not relinquish a right to exclude the deputies from the home, and the record reflects that the Defendant was unable to reenter the home because his keys were locked inside. The record supports a conclusion that the Defendant did not affirmatively and expressly disclaim or relinquish his privacy interest in the home. The Defendant's leaving on foot after answering the deputies' questions and after the deputies told him he was free to leave is of no consequence to this case. The Defendant was locked out of the home and did not possess keys to any of the vehicles parked in the driveway. As a result, we conclude that the Defendant had standing to challenge the subsequent search.

The State does not challenge the trial court's determination regarding the deputies' exceeding the scope of the levy by entering the curtilage of the home. Rather, the State argues that the deputies did not violate the Defendant's Fourth Amendment rights by entering the curtilage of the home because the Defendant had disclaimed any privacy interest in the home. Because we have concluded that the Defendant did not disclaim his privacy interest in the home and because the parties do not challenge the trial court's determinations regarding the deputies' exceeding the scope of a valid levy by entering the curtilage, we conclude that the trial court did not err by granting the Defendant's motion to suppress and by dismissing the charge against him.

Based upon the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE